## SCHOLARSHIP ENDOWMENT FOUNDATION v. NICHOLAS, Collector of Internal Revenue.

### No. 11147.

District Court, D. Colorado.
Nov. 30, 1938.

512

Wilbur F. Denious, Hudson Moore, and Dayton Denious, all of Denver, Colo., for plaintiff.

Thomas J. Morrissey, U. S. Atty., and Ivor O. Wingren, Asst. U. S. Atty., both of Denver, Colo., for defendant.

SYMES, District Judge.

The plaintiff corporation sues the defendant Collector of Internal Revenue to recover alleged illegal and erroneous income and excess profit taxes assessed and paid for the calendar year 1936, and likewise alleged illegal and erroneous capital stock taxes for the years ending June 7th, 1936 and 1937 respectively. Its counsel argues it is, and has been at all times since its organization, operated exclusively for educational purposes and is exempt from these taxes. § 101(6), Revenue Act of 1936, Tit. 26, § 103, subdivision 6, U.S.C. A., presently set forth. All procedural steps preliminary to the institution of this suit have been taken.

The undisputed facts are:

One Benjamin M. Rastall, his wife, Ocella S. Rastall and Wilbur F. Denious, organized the plaintiff corporation under the laws of Colorado (C.S.A.1935, Ch. 41, Art. 13, §§ 172–176), as a non-profit corporation. The certificate of incorporation says its objects are to aid and encourage students and others to secure an education and engage in any and all forms of activities for assisting and training students and others for leadership, or better to enable them to meet the duties and responsibilities of American citizenship, etc., to receive gifts, bequests and devises of property or money, and to hold and invest the same, etc. To handle the same free from the restrictions applicable to trust funds, except such valid restrictions as may be imposed by the donor.

As originally drawn the by-laws contained a provision that the trustees named (three in number, Rastall, his wife and one other) shall accept all donations that are in accord with its purposes and invest and reinvest the same until the total funds amount to $1,000,000, at which time they shall lend to young persons residing in the Rocky Mountain regions such amounts as they may see fit to aid such persons in securing training or education in their chosen fields—all upon terms to be fixed by the trustees. Coincident with its incorporation and on April 27, 1932, Rastall turned over to the corporation corporate stocks and bonds of the value of $34,000, in consideration of an agreement by the corporation that it would pay to Rastall during his life, and after his death to his wife for her life, all the net income from the securities so conveyed.

No donations for scholarships were made by the corporation in 1932 or 1933, but Rastall received $1,400 on account. On May 1, 1934 Rastall and the corporation entered into a new agreement cancelling the agreement referred to and providing that the corporation would pay to Rastall $5,000 annually during his life, and after his death the same amount to his wife for her life. This instrument was signed by Rastall as president of the corporation as party of the first part and by Rastall individually as party of the second part. Thereafter, in 1934, $100 was paid out for scholarships, $200 in 1935 and in 1936, the tax year in question, $1,000 was divided between three Colorado educational institutions. The gross income for 1936

amounted to $15,711.66, of which $11,241.93 was capital gain—a non-recurring income item of course. Dividends $4,026.19. After charging off Rastall's $5,000 annuity, the corrected net income for the year was $10,075.81. Mr. Rastall actually drew $2,000 on account of his annuity under the new contract.

Sec. 101, Revenue Act of 1936, 26 U. S.C.A. § 103, provides:

"The following organizations shall be exempt from taxation under this title [chapter] * * *

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the· activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

The two questions presented may be stated in the language of subdivisions (1) and (2) of Regulations 94, interpreting this section. They are:

"(1) It must be organized and operated exclusively for one or more of the specified purposes;

"(2) Its net income must not inure in whole or in part to the benefit of private shareholders or individuals;"

What are the earmarks of charitable trusts? In the Dartmouth College Case, Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629, Chief Justice Marshall discusses corporations, private, public, charitable, etc. Referring to the latter class he says public-spirited individuals, desirous of making permanent appropriations for charitable or other useful and worthy purposes, have found it is preferable, if not necessary, to adopt the corporate form of organization, the benefit to the public being considered ample consideration for a charter, which in those days was not granted as a matter of course.

The following excerpts describe the relation of the donor to the corporation (page 641): "The founders of the college, at least, those whose contributions were in money, have parted with the property bestowed upon it, and their representatives have no interest in that property. The donors of land are equally without interest, so long as the corporation shall exist."

(Page 642): "These gifts were made, not indeed to make a profit for the donors, or their posterity, * * *. The consideration for which they stipulated, is the perpetual application of the fund to its object, in the mode prescribed by themselves."

"The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal."

11 C.J. § 9, p. 303, declares charitable corporations are such as are constituted for the perpetual distribution of the free alms of the founders, that a distinctive feature is they make no provision for making dividends or profits, but hold their funds in trust for the object of the institution. The test of whether an enterprise is charitable or not is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit or private advantage. Further, on page 307: "It is necessary that there should be a gift, as the doctrine of charitable uses is inapplicable to a grant for a consideration in return."

In Restatement of the Law (Trusts, Vol. 2, § 376), it is pointed out: (b) The mere fact that persons who are not objects of charity incidentally benefit from the maintenance of a charitable institution does not prevent it from being charitable, but "If, however, the fixing of a salary is merely a device for securing the profits of the institution and not merely compensation for services rendered, the institution is not a charitable institution."

And further (d), a charitable trust has not ceased to be such because its operations result in a profit "provided that the profits are to be applied only to charitable purposes."

And finally, in 61 C.J. § 500, p. 452, under the title Tax Exemptions, we find this: "In determining whether an institution falls within the scope of the exemption statutes the courts will consider not only the declared objects of the charitable or benevolent institution, but also what it actually does."

■ And according to 11 C.J. 303, § 9, charitable organizations that are· exempt from taxation are much smaller in number and the fact that they receive gifts or bequests for charitable purposes does not

necessarily entitle them to tax exemption. See Trustees of Young Men's Christian Ass'n v. City of Paterson, 61 N.J.L. 420, 39 A. 655, affirmed 64 N.J.L. 361, 45 A. 1092. All this authority is pertinent to our discussion and it may well be the draftsmen of subdivision 6, supra, had it in mind.

It would seem, therefore, the method followed for devoting funds to charitable purposes consists of an absolute outright gift to a corporation or trustees accompanied by a declaration of the objects of the gift. As we have seen a grant for a consideration in return, a quid pro quo, is not recognized as a charitable trust. In other words an outright gift, without power of revocation, or retention of control by the donor, is the requirement, excepting of course the right of action remaining in the donor to compel enforcement of the terms of the gift.

What is the record before us: The donor is president, and with his wife constitutes a majority of the trustees of the corporation to which he made the gift and granting without deciding that the first contract Rastall made with the corporation did not exclude the exemption, surely the tax situation changed when it was disclosed that he and the corporation had power to cancel it and make a new one.

Necessarily the donor's intent is material in cases of this nature. Intent is an intangible mental attitude incapable of proof, so we determine it as a fact from the acts of the individuals concerned, who are presumed to intend the consequences that usually flow from their conduct. So these undisputed facts become pertinent: That under the first contract the donor was to receive the entire income leaving nothing for charitable objects. Then a new agreement was entered into still more favorable to him, signed by him as an individual and also as president of the corporation. That Rastall managed the financial affairs of the corporation, as a result of which according to counsel, its funds were greatly increased. That Article 11 of the by-laws as originally drawn provided the corporation should accumulate a fund of $1,000,000 before granting any loans. On objection by the Commissioner of Internal Revenue this was changed to

permit the corporation to grant loans or scholarships at any time, and that since 1932 total disbursements for charitable purposes were $1,300. The largest for any one year was $1,000 in 1936 when the gross income was $15,000.

Another observation: There is no beneficiary who can compel the use of the funds for charitable purposes. The donor his wife and the third trustee are beholden to no one in management of the property. And what hinders the making of new contracts still more favorable to the donor today, or in the years to come. Possibly there is a right of action in the Attorney General, if the members should dissolve the corporation and attempt to dispose of the corpus—a remote contingency at best.

We have no quarrel with Harrison v. Barker Annuity Fund, 7 Cir., 90 F.2d 286. Judge Lindley, page 289, referring to the donor, says "There is no taint of personal or selfish motives. The donor gained nothing except to promote a plan of just reward to persons to whom she owed nothing, for virtues worthy of emulation in people generally." Like all other cases cited it turns upon its particular facts. Neither in that case nor any we have read did the donor contract for and receive substantial benefits from the trust while retaining power to change its financial setup from time to time, as in the case at bar.

The language of the statute "organized and operated exclusively for * * * educational purposes * * *" is too clear for quibbling. It requires the application of the entire income to the purposes named before the exemption can be claimed, excepting of course salaries and other usual and necessary expenses of administration paid on a quantum meruit basis. The payments to Rastall are not, however, defended on that ground.

One claiming an exemption from taxation must prove a right to the same and that all doubts which may arise in a particular case are of course to be resolved in favor of the state.

All we decide is that when the plaintiff contracted for a personal monetary enrichment to Rastall it forfeited any right to the exemption claimed.

The bill must be dismissed with costs.